# In the United States Court of Federal Claims

| | |
|---|---|
| ALAMO CITY ENGINEERING SERVICES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 25-cv-579<br><br>Filed Under Seal: July 21, 2026<br><br>Publication: July 29, 2026[1] |

*Steven Herrera* of Bradley Arant Boult Cummings LLP, Houston, TX, argued for Plaintiff. With him on the briefs were *Aron Beezley*, *Nathaniel J. Greeson*, and *Owen E. Salyers* of Bradley Arant Boult Cummings LLP, Washington, D.C., and *Alexander Grant Thrasher*, Bradley Arant Boult Cummings LLP, Birmingham, AL.

*Nelson Kuan* of the United States Department of Justice, Civil Division, Washington, D.C. argued for Defendant. With him on the briefs were *Albert S. Iarossi*, *Patricia M. McCarthy*, and *Brett A. Shumate* of the United States Department of Justice, Civil Division, Washington, D.C., and *Jack D. Myers* and *Ashley Kelly* of the Defense Logistics Agency.

**MEMORANDUM AND ORDER**

On May 24, 2020, Plaintiff Alamo City Engineering Services, Inc. (Alamo City or ACES) entered into Order Number SP4701-20-F-0078 (Task Order) with the Defense Logistics Agency (DLA), an agency of Defendant the United States, promising to configure SAP enterprise software that DLA uses to manage stock in its warehouses. ECF No. 1 (Complaint) ¶¶ 2, 5, 6. After

[1] This Memorandum and Order was filed under seal in accordance with the Court's order allowing exhibits to the Motion to Dismiss to be filed under seal. ECF No. 14 (Motion for Leave to File Under Seal); Minute Order dated Aug. 12, 2025 (granting Motion for Leave to File Under Seal). On July 28, 2026, the parties informed the Court that there were no proposed redactions. ECF No. 30 (Notice Regarding Proposed Redactions). The sealed and public versions of this Memorandum and Order are identical, except for this footnote and the publication date.

performance began, ACES learned that DLA's software was not configured according to the conditions that were allegedly promised in the specifications, requiring more work than ACES had expected. *Id.* ¶¶ 13–14. DLA had configured its SAP software in an Internet Demonstration and Evaluation System (IDES) environment, rather than the operational environment that ACES had expected. *Id.* ¶ 10. The parties bilaterally modified the Task Order repeatedly to account for the increased scope of work caused by the IDES environment. *Id.* ¶¶ 16, 18, 21.

Even after these modifications however, ACES claimed that the IDES environment was a defective specification that constructively changed the work required under the Task Order and accordingly requested an adjustment of $3,805,934.12 above the contract price. *Id.* ¶ 22. Accordingly, on November 28, 2023, ACES filed a certified claim with its contracting officer (CO) concerning the alleged changes. *Id.* ¶ 27; *see* ECF No. 20-4 (Certified Claim). The Certified Claim also alleged that the CO had failed to collaborate with ACES to mitigate the challenges posed by the IDES environment. Certified Claim at 2. On April 2, 2024, the CO denied the Certified Claim. *See* ECF No. 20-5 at 1.

Subsequently, ACES filed its Complaint in this Court under the Contract Disputes Act (CDA). ACES includes two counts in its Complaint, each based on a different legal theory: (1) defective specifications, and (2) the implied duty of good faith and fair dealing. Compl. ¶¶ 30, 39. Defendant now seeks to dismiss ACES's Complaint for lack of jurisdiction and for failure to state a claim. *See* ECF No. 13 at 5[2] (Motion to Dismiss or Motion). Defendant makes four arguments: (1) Plaintiff fails to demonstrate Article III standing for the entire Complaint, (2) Plaintiff failed to present its good faith and fair dealing claim to the CO in the Certified Claim, (3) Plaintiff has

---

[2] Citations throughout this Memorandum and Order correspond to the ECF-assigned page numbers, which do not always correspond to the pagination within the document.

failed to plead plausible facts showing that DLA provided defective specifications, and (4) Plaintiff has failed to plead plausible facts establishing a breach of the implied duty of good faith and fair dealing. *Id.* at 5–6. For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Dismiss (ECF No. 13). The Court **DENIES** Defendant's Rule 12(b)(1) Motion to Dismiss alleging a lack of subject matter jurisdiction. The Court **GRANTS** Defendant's Rule 12(b)(6) Motion to Dismiss for failure to state a claim with respect to Count One of the Complaint, concerning defective specifications for the IDES environment, and accordingly **DISMISSES** Count One. The Court **DENIES** Defendant's Rule 12(b)(6) Motion to Dismiss for failure to state a claim with respect to Count Two of the Complaint, concerning DLA's alleged breach of the implied covenant of good faith and fair dealing.

## BACKGROUND[3]

On May 24, 2020, DLA awarded ACES Order Number SP-4701-20-F-0078 (Task Order), from Contract Number GS-35F-0598S. Compl. ¶ 5. The Task Order procured "SAP Support Services for the Configuration of DLA Business Segments in support of Warehouse Management System (WMS)." *Id.* ¶ 6. The original base period of performance ran from the date of award for one year, to May 23, 2021. *Id.* ¶ 7. The Task Order included two one-year options, through which

[3] At this motion to dismiss stage, the Court does not make factual findings; rather, the Court accepts the well-pleaded facts in the Complaint as true for purposes of resolving a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Boyd v. United States*, 134 F.4th 1348, 1352 (Fed. Cir. 2025) ("'We take all factual allegations in the complaint as true and construe the facts in the light most favorable to the non-moving party.'" (quoting *Jones v. United States*, 846 F.3d 1343, 1351 (Fed. Cir. 2017))). As Defendant in its Motions does not controvert any factual allegations in the Complaint, the Court also accepts as true all well-pleaded facts for purposes of the resolving Defendant's Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *See infra* Discussion I; *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014) ("In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all uncontroverted factual allegations in the complaint, and construes them in the light most favorable to the plaintiff.").

DLA could extend performance through May 23, 2022, and May 23, 2023. *Id.* DLA issued a stop work order on June 2, 2020, shortly after performance began. *Id.* ¶ 8. DLA lifted the stop work order on July 20, 2020, and ACES subsequently began performance. *Id.* ¶ 8–9.

At an unspecified time in "mid-2020," after performance had resumed, ACES viewed "a slide from another contractor" during a meeting with DLA, which revealed that DLA had supplied the Minimal Viable Product (MVP) SAP WMS in an Internet Demonstration and Evaluation System (IDES) environment. *Id.* ¶ 10. An IDES environment is different from an operational environment—the environment which ACES had expected. *Id.* ¶ 12. According to ACES, the IDES environment posed problems for development because "[d]eploying a system in IDES may not reveal performance, integration, or security challenges that could arise in actual operations." *Id.* ¶ 11. According to ACES, "[a]n IDES environment is a controlled setting for testing and evaluation, whereas an operational environment reflects real-world conditions with live data, security constraints, and mission-critical demands." *Id.*

Before this meeting, ACES allegedly had not been aware that DLA used an IDES environment, and ACES contends that DLA had not informed ACES of the IDES environment. *Id.* ¶ 12. Subsequently, ACES "notified DLA that deployment in the IDES environment was a changed condition of the work and would result in significant re-work to build its MVP SAP WMS in an operational environment for use by DLA." *Id.* ¶ 13. ACES contends that it "was required to conduct significant additional work beyond what was originally contemplated under the Contract to salvage the existing SAP WMS solution from the IDES environment" because DLA used an IDES environment. *Id.* ¶ 14. ACES asserts that such additional work led ACES "to incur additional costs associated with both the hiring [of] additional personnel and working overtime hours." *Id.* ¶ 15. ACES also claims that while the Task Order required it to purchase 30 SAP

classroom sessions to train DLA staff, DLA required ACES to perform "many more" classroom sessions. *Id*. ¶¶ 27, 35.

Following the discovery of the IDES environment, on September 15, 2020, the parties executed a bilateral modification (Modification P00002) to the contract. *Id.* ¶ 16. This modification extended the base period of performance through July 10, 2021. *Id.* Under Modification P00002, the periods of performance in DLA's Options 1 and 2 were also modified: Option 1 would extend performance until July 10, 2022, and Option 2 would extend performance until July 10, 2023, if exercised. *Id.* DLA exercised Option 1 on June 30, 2021. *Id.* ¶ 17.

Several more modifications followed before the contract expired. The parties bilaterally modified the contract (Modification P00014) on August 12, 2021. *Id.* ¶ 18. According to ACES, this modification changed the scope of work and "recognized that the 'IDES environment was deficient because software was outdated, non-DLA sample customer data resid[ed] within, limitations with licensing of software, and servers weren't sized adequately.'" *Id.* On July 6, 2022, DLA exercised Option 2, extending the period of performance until July 10, 2023. *Id.* ¶ 19. DLA then unilaterally extended the period of performance to August 10, 2023. *Id.* ¶ 20. Subsequently, the parties bilaterally modified the contract to extend the period of performance to September 10, 2023. *Id.* ¶ 21.

ACES submitted a Request for Equitable Adjustment (REA) to DLA on September 25, 2023, in which it sought to recover costs arising from the IDES environment. *Id.* ¶ 22. The REA characterized the IDES environment as an "express and constructive change[] caused by the government" that forced ACES to perform work beyond the contract requirements. *Id.* The REA alleged that "DLA also interfered with ACES's means and methods of performing its work under the Contract." *Id.* ¶ 24. DLA rejected the REA on November 22, 2023. *Id.* ¶ 26.

After receiving the denial of its REA, ACES submitted a certified claim to the CO on November 28, 2023. Certified Claim at 1. The Certified Claim requested payment of $3,805,934.12 "due to the existence of numerous differing site conditions, the existence of which significantly impacted and increased ACES' costs and time of performance on the subject contract." *Id.* These alleged differing site conditions included an "inaccurate description" of each of the following: "Business Process Re-engineering (BPR) lots," "Distribution Standard Systems (DSS) services," "Agile services," "SAP [IDES] services," and "platform configuration services." *Id.* The Certified Claim also alleged a "failure to collaborate effectively" by DLA, including a "failure to provide sufficient resources as required under the contract." *Id.* at 2. The Certified Claim alleged that DLA "directed and controlled the methods used by the contractor in its performance of the services under the contract," including by not mentioning the IDES environment. *Id.* The Certified Claim also claimed that "DLA's inaccurate description of SAP classroom sessions to be performed (i.e., 30 courses described, but many more required)" constituted a constructive change. *Id.* at 1.

On April 2, 2024, the CO denied ACES's Certified Claim. *See* ECF No. 20-5 at 1.

**PROCEDURAL HISTORY**

Plaintiff filed its Complaint on April 2, 2025, but due to a docketing error by the Clerk of Court, Defendant's counsel, the Department of Justice, was not served with the Complaint until June 12, 2025. *See* ECF Nos. 1 (Complaint), 10 at 1. Subsequently, on August 12, 2025, Defendant filed the present Motion to Dismiss under seal. *See* Motion; ECF No. 14 at 1; Minute

Order dated Aug. 12, 2025. The Court conducted oral argument on February 10, 2026. *See* Minute Entry dated Feb. 10, 2026. The Motion is fully briefed and ripe for review.[4]

**STATUTORY FRAMEWORK**

Under Section 1491(a)(2) of the Tucker Act, this Court has jurisdiction over claims brought under the Contracts Dispute Act (CDA). 28 U.S.C. § 1491(a)(2) ("The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 . . . ."); *see* 41 U.S.C. § 7101, *et seq.* "The CDA exclusively governs Government contracts and Government contract disputes." *Cecile Indus., Inc. v. Cheney*, 995 F.2d 1052, 1055 (Fed. Cir. 1993); *see Boeing Co. v. United States*, 968 F.3d 1371, 1381 (Fed. Cir. 2020) ("[A] 'matter of contract administration . . . can only be challenged under the Contract Disputes Act.'" (quoting *Coast Pro., Inc. v. United States*, 828 F.3d 1349, 1355 (Fed. Cir. 2016)). Thus, "[w]hen the Contract Disputes Act applies, it provides the exclusive mechanism for dispute resolution." *Tex. Health Choice, L.C. v. Off. of Pers. Mgmt.*, 400 F.3d 895, 898–99 (Fed. Cir. 2005) (alteration in original) (quoting *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995)).

The CDA imposes strict jurisdictional prerequisites, which must be met for each individual claim. *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1005 (Fed. Cir. 2015) (citing *Joseph Morton Co. v. United States*, 757 F.2d 1273, 1281 (Fed. Cir. 1985)); *see M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327–39 (Fed. Cir. 2010). To establish jurisdiction under the CDA, a plaintiff must demonstrate that it (i) previously submitted each claim to the contracting officer, and (ii) received a final decision from the contracting officer on each claim. *K-Con Bldg.*

---

[4] *See* Defendant's Motion to Dismiss, ECF No. 13; Plaintiff's Response in Opposition, ECF No. 20 (Resp.); Defendant's Reply in support of its Motion, ECF No. 21 (Reply).

*Sys.*, 778 F.3d at 1005 (citing *James M. Ellett Constr. Co. v. United States,* 93 F.3d 1537, 1541 (Fed. Cir. 1996)); *see also Tolliver Grp., Inc. v. United States*, 20 F.4th 771, 775 (Fed. Cir. 2021) ("The CDA mandates that '[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision.'" (quoting 41 U.S.C. § 7103(a)(1))). "A claim is 'a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract.'" *K-Con Bldg. Sys.*, 778 F.3d at 1005 (quoting *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed. Cir. 1995) (en banc)). The claim must present a "clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim" to satisfy the jurisdictional presentment requirement. *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003).

## LEGAL STANDARD

### I. Rule 12(b)(1)

This Court must dismiss claims outside its subject matter jurisdiction. Rules 12(b)(1), 12(h)(3); *St. Bernard Par. Gov't v. United States*, 916 F.3d 987, 992–993 (Fed. Cir. 2019) ("It is well settled that limitations on subject matter jurisdiction are not waivable . . . ."). When deciding a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), this Court "accepts as true all uncontroverted factual allegations in the complaint, and construes them in the light most favorable to the plaintiff." *Estes Express Lines*, 739 F.3d at 692; *see also Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir. 2014).

When "a motion to dismiss 'challenges the truth of the jurisdictional facts,' the Court of Federal Claims 'may consider relevant evidence in order to resolve the factual dispute.'" *Freeman*

*v. United States*, 875 F.3d 623, 627 (Fed. Cir. 2017) (quoting *Banks*, 741 F.3d at 1277); *see also Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). When a Rule 12(b)(1) motion challenges jurisdictional facts—those facts pled in a complaint to establish jurisdiction—then the Court will consider those facts that either the defendant does not contest and those that the plaintiff supports with extrinsic evidence. *See Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012) ("If a Rule 12(b)(1) motion challenges a complaint's allegations of jurisdiction, the factual allegations in the complaint are not controlling and only uncontroverted factual allegations are accepted as true. . . . [i]n resolving these disputed predicate jurisdictional facts, 'a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings.'" (quoting *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993))). Once the defendant disputes jurisdictional facts in a motion to dismiss, the burden shifts to the plaintiff to provide evidence for the jurisdictional facts. *Reynolds*, 846 F.2d at 748; *see Estes Express Lines*, 739 F.3d at 692 ("The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence."). On the other hand, when "a Rule 12(b)(1) motion simply challenges the court's subject matter jurisdiction based on the sufficiency of the pleading's allegations—that is, the movant presents a 'facial' attack on the pleading—then those allegations are taken as true and construed in a light most favorable to the complainant." *Cedars-Sinai Med. Ctr.*, 11 F.3d at 1583.

## II. Rule 12(b)(6)

To withstand a motion to dismiss pursuant to 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff also must establish "more than a sheer possibility that a defendant has acted

unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). Thus, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555, 557) (second alteration in original) (internal citations omitted). "The Court of Federal Claims may properly grant a motion to dismiss under [Rule] 12(b)(6) when a complaint does not allege facts that show the plaintiff is entitled to the legal remedy sought." *Steffen v. United States*, 995 F.3d 1377, 1379 (Fed. Cir. 2021) (citing *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)).

At the motion to dismiss stage, this Court must "take all factual allegations in the complaint as true and construe the facts in the light most favorable to the non-moving party." *Boyd v. United States*, 134 F.4th 1348, 1352 (Fed. Cir. 2025) (quoting *Jones v. United States*, 846 F.3d 1343, 1351 (Fed. Cir. 2017)). The Court, however, need not "accept the asserted legal conclusions." *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1380 (Fed. Cir. 2019). The Court "must consider the complaint in its entirety" as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). The Court may rely on exhibits attached to the Complaint, as these "are not 'matters outside the pleadings.'" *Sharifi v. United States*, 987 F.3d 1063, 1067 (Fed. Cir. 2021) (quoting Rule 12(d)); *see also AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27, 34 (Fed. Cir. 2024) ("Review of a motion to dismiss under Rule 12(b)(6) is generally limited 'to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference.'" (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007)). "In the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." *Allen Eng'g*

*Contractor, Inc. v. United States*, 115 Fed. Cl. 457, 464 (2014), *aff'd*, 611 F. App'x 701 (quoting *Fayetteville Invs. v. Com. Builders*, 936 F.2d 1462, 1465 (4th Cir. 1991)); 5A Wright & Miller's Federal Practice and Procedure § 1327 (3d ed. 2004 & Supp. 2016) (explaining that the Court "obviously is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions"); *see also Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320, 1325–26 (Fed. Cir. 2016) (favorably quoting Wright & Miller § 1327).

## DISCUSSION

This Discussion proceeds in four sections, corresponding to the four arguments raised by the Motion.

*First*, Defendant argues that Plaintiff lacks Article III standing because Plaintiff's injuries are not traceable to the alleged breach of contract. Specifically, Defendant contends that later contract modifications broke the "chain of causation" between the original contract (upon which Plaintiff brings its claims) and the injuries it asserts here. However, the presence of later modifications to the contract does not waive any claims that might have accrued to Plaintiff. Plaintiff has standing here because it pleads injuries caused by DLA's actions that were not addressed by later contract modifications.

*Second*, Defendant asserts that Plaintiff failed to meet the CDA's jurisdictional presentment requirement for Count Two of the Complaint. Specifically, Defendant argues that Plaintiff never presented a good faith and fair dealing claim to the CO because the Certified Claim did not include the words "good faith and fair dealing." To the contrary, Plaintiff need not use specific legal terms to meet the presentment requirement; rather, it needs only to present a certified claim to the CO that relies upon the same operative facts as the claim asserted in this Court.

Plaintiff satisfied the presentment requirement here because the Certified Claim relied upon the same operative facts as the Complaint.

*Third*, Defendant asserts that Plaintiff failed to state a claim based on defective specifications. Defendant argues that Plaintiff's Complaint failed to identify any design specifications in the Task Order, and that a defective specification claim requires a design specification. The Court agrees. Plaintiff only identifies performance specifications in the Task Order, rather than design specifications. Plaintiff has thus failed to state a defective specification claim.

*Fourth* and finally, Defendant argues that Plaintiff failed to state a superior knowledge claim based on the implied duty of good faith and fair dealing. Defendant contends that a superior knowledge claim requires DLA to have more knowledge than Plaintiff, and that here DLA was unlikely to have more knowledge than Plaintiff. However, Plaintiff pleads that DLA had superior knowledge and, at this stage, the Court must take as true all plausible facts that are pled. As such, the Court holds that Plaintiff has sufficiently pleaded a claim for breach of the implied duty of good faith and fair dealing, based on DLA's superior knowledge.

## I. Article III Standing

Defendant first challenges Plaintiff's ability to meet the traceability requirement of Article III standing. *See* Mot. at 12. The Court of Federal Claims "applies the same standing requirements enforced by other federal courts created under Article III." *Starr Int'l Co., Inc. v. United States*, 856 F.3d 953, 964 (Fed. Cir. 2017) (quoting *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003)). Article III standing has three requirements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578

U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see Associated Energy Grp., LLC v. United States*, 131 F.4th 1312, 1318 (Fed. Cir. 2025) (same). "Article III standing . . . is a threshold jurisdictional issue." *Associated Energy Grp.*, 131 F.4th at1317. At issue in this case is Plaintiff's ability to prove the second requirement, traceability. Mot. at 13. The traceability questions asks whether there is "a causal connection between the injury and the conduct complained of." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (quoting *Lujan*, 504 U.S. at 560); *see also Lujan*, 504 U.S. at 560 (cleaned up) ("[T]he injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.").

Here, Defendant moves to dismiss the Complaint pursuant to Rule 12(b)(1) for lack of jurisdiction because Plaintiff "has not alleged sufficient facts showing that ACES' additional 'costs' were fairly traceable to the purported 'deficient specifications' provided by DLA." Mot. at 13. In particular, Defendant argues that the repeated bilateral modifications and DLA's exercise of options broke the "alleged chain of causation" from DLA's alleged defective specification. *Id.* at 12. Defendant contends that the modifications and options caused the increased work that Plaintiff blames on defective specification. *Id.*; *see* Reply at 8 ("Allegation of injury caused by a defendant's action that was different from the conduct complained of should nevertheless be dismissed."). Notably, Defendant does not cite any cases in its briefing in which a contractor with a valid government contract lacked standing to bring a breach of contract claim. *See* Mot.; Reply.

In response, Plaintiff makes two arguments in support of traceability. First, Plaintiff argues that the Complaint pleads traceability because the Complaint "points to the actions of one entity—and one entity only: Defense Logistics Agency." Resp. at 15. Plaintiff cites several cases for the proposition that "the Court of Federal Claims has consistently found traceability when contractors

plead the Government *solely and directly* caused its damages." *Id.* (emphasis in original); *see Walsh Constr. Co. v. United States*, 140 Fed. Cl. 385, 404 (2018); *RDA Constr. Corp. v. United States*, 132 Fed. Cl. 732, 766 (2017), *aff'd*, 739 F. App'x 644 (Fed. Cir. 2018); *NCLN20, Inc. v. United States*, 99 Fed. Cl. 734, 750 (2011), *aff'd*, 495 F. App'x 94 (Fed. Cir. 2012). Plaintiff argues it has met the standard for traceability because the Complaint alleges conduct exclusively caused by DLA led to Plaintiff's injuries. *Id.* at 15–16.

Second, Plaintiff rebuts Defendant's arguments that the bilateral modifications waived any claim to defective specifications for the original contract and that the alleged injury of increased workload stemmed from the modifications, not the defective specifications. Resp. at 18. Plaintiff asserts Defendant's contentions are each questions of fact, which are inappropriate to be resolved at this stage of litigation. *Id.* ("That is a factual dispute—plain and simple.").

It is clear that Plaintiff has standing to bring its suit. Defendant's argument confuses the merits question of causation for purposes of liability with causation needed to establish traceability. This action instead resembles *Centech*, in which the chain of causation was not too "attenuated from the Government's purported actions" to defeat traceability. *See Centech Grp., Inc. v. United States*, 167 Fed. Cl. 1, 8 (2023). There, the defendant challenged traceability because several intervening events occurred between the defendant's actions and the damages that led to the suit: the defendant authorized a subcontractor to purchase materials, then refused to accept the materials, so the subcontractor had to cancel the order, for which the contractor refused to reimburse the subcontractor, and the supplier sued the subcontractor. *Id.* at 6–7. The defendant's argument failed in *Centech* because plaintiff had adequately pleaded that the defendant was the but-for cause of the injury, which met the traceability requirement for standing purposes. *Id.* at 7. Here, similarly, Plaintiff alleges that if not for the DLA's alleged provision of defective

specifications, Plaintiff would not have incurred the injury of increased work: "Upon ACES's discovery that it had been working in an IDES environment since the beginning of the Contract, ACES notified DLA that deployment in the IDES environment was a changed condition of the work and would result in [a] significant re-work." Compl. ¶ 13. Although there were several bilateral modifications, Plaintiff alleges further increased costs that the bilateral modifications did not address. *Id.* ¶ 22. Indeed, traceability is more straightforward here than in *Centech* because, here, no third parties contributed to the alleged injuries. *See Centech*, 167 Fed. Cl. at 7. Here, Plaintiff claims that DLA caused injuries, and that no other actors participated in the chain of causation, so the alleged injury was "not the result of the independent action of some third party not before the court." *See Lujan*, 504 U.S. at 560 (cleaned up) (quoting *Simon v. Eastern Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)). As such, Plaintiff has properly established traceability for standing purposes in this case. *See id.*

Defendant's arguments that modifications to the Task Order break any causal chain between the alleged harm and injury belong at a later stage of the case. *See* Mot. at 12. Defendant argues that the "alleged chain of causation was broken by the repeated modifications to the task order." *Id.* However, Plaintiff alleges that the defective specifications caused increased costs that the bilateral modifications did not address. Compl. ¶ 22 ("On September 25, 2023, ACES submitted a request for equitable adjustment seeking $3,805,934.12 in additional compensation for 'express and constructive changes caused by the government' that 'significantly increased ACES' costs and time of performance under the [C]ontract.'"). "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *James v. J2 Cloud Servs., LLC*, 887 F.3d 1368, 1372 (Fed. Cir. 2018). Defendant has

failed to introduce contrary evidence or point to any contract modification provisions that waived or settled ACES' legal argument. *See* Mot.; Reply. Thus, accepting the facts as pled, the Complaint alleges an injury (increased costs) traceable to the harm (defective specifications *not addressed by the modifications*), sufficient to meet the traceability requirement. *See Brown*, 600 U.S. at 561. Defendant's argument that the increased costs stemmed only from the Task Order modifications, rather than any defective specifications, is more appropriate for adjudication at summary judgment.

Defendant also argues in its Reply that it has "challenged ACES' allegations of jurisdictional facts," so that ACES now bears a burden to present evidence supporting the facts. *See* Reply at 6–7. However, Defendant does not, in fact, challenge any of the facts that support jurisdiction. Throughout the Motion and the Reply, Defendant cites a single paragraph that it challenges from the Complaint, but that paragraph offers a conclusion of law at the end of the Complaint's Count One and does not plead any jurisdictional facts. *See* Reply at 6 (challenging Compl. ¶ 36); *see also* Compl. ¶ 36 ("These various specification deficiencies caused ACES to perform work and incur costs beyond what was originally contemplated under the Contract and for which ACES is entitled to payment."). Defendant claims that another paragraph in the Complaint contradicts Plaintiff's argument that the allegedly defective specifications increased the scope of work because the paragraph acknowledges that modifications to the Task Order increased the scope of work. *See* Mot. at 12 (arguing that Compl. ¶ 18 contradicts traceability) ("The complaint admits that ACES agreed to Modification P00014 in 'modifying the work to be performed' to address the alleged development environment issue."). However, as discussed above, the fact that the parties modified the Task Order to increase the scope of work does not foreclose the possibility, as the Complaint pleads, that defective specifications also increased the

scope of work. Defendant has therefore failed to identify any contradictions in the Complaint that defeat jurisdiction. As Defendant has not challenged any jurisdictional facts, the Court must accept the facts in the Complaint as true. *See Trusted Integration Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). Based on these relevant undisputed facts as alleged in the Complaint, Plaintiff has established standing.

## II. Presentment

Defendant argues that this Court lacks jurisdiction because ACES failed to meet the presentment requirement for its claim in Count Two of the Complaint, based on the implied duty of good faith and fair dealing. Mot. at 13. The CDA requires that each claim in this Court must have been "previously presented to and denied by the contracting officer." *Scott Timber*, 333 F.3d at 1365 (quoting *Cerberonics, Inc. v. United States,* 13 Cl. Ct. 415, 417 (1987)). To establish jurisdiction under the CDA, a plaintiff must both (i) submit each claim to the contracting officer and (ii) receive a final decision from the contracting officer on each claim. *K-Con Bldg. Sys.*, 778 F.3d at 1005; *see also Raytheon Co. v. United States*, 747 F.3d 1341, 1354 (Fed. Cir. 2014) (citing 41 U.S.C. § 7103(a)(3)) ("It is a bedrock principle of government contract law that contract claims, whether asserted by the contractor or the Government, must be the subject of a contracting officer's final decision."). Presentment is a jurisdictional requirement for CDA claims in the Court of Federal Claims. *See Tolliver Grp.*, 20 F.4th at 776; *see also Avant Assessment, LLC v. United States*, 171 Fed. Cl. 212, 216 (2024), *aff'd*, No. 2024-2054, 2025 WL 3511163 (Fed. Cir. Dec. 8, 2025) (finding that the presentment requirement remains jurisdictional after *ECC Int'l Constrs., LLC v. Sec'y of the Army*, 79 F.4th 1364 (Fed. Cir. 2023)).

"A claim need not 'be submitted in any particular form or use any particular wording . . . .'" *K-Con Bldg. Sys.*, 778 F.3d at 1005 (quoting *Contract Cleaning Maint., Inc. v. United States*, 811

F.2d 586,592 (Fed. Cir. 1987)). Rather, the contractor must "submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Scott Timber*, 333 F.3d at 1365 (quoting *Contract Cleaning Maint.*, 811 F.2d at 592); *see also Tolliver Grp.*, 20 F.4th at 776 ("The focus is on whether the contracting officer was given 'an ample pre-suit opportunity to rule on a request, knowing at least the relief sought and what substantive issues are raised by the request.'" (quoting *K-Con Bldg. Sys.*, 778 F.3d at 1006)). To determine if a claim has been presented, the key question is whether the claim presented in this Court "is the 'same claim' as the one presented to the contracting officer." *Tolliver Grp.*, 20 F.4th at 776 (quoting *Raytheon*, 747 F.3d at 1354). To determine if the claims are the same, courts assess whether the claims "arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery." *Scott Timber*, 333 F.3d at 1365.

Defendant contends that Plaintiff did not satisfy the presentment requirement for its implied duty of good faith and fair dealing claim because ACES's "certified claim never expressly asserts that DLA breached any implied duty of good faith and fair dealing—none of those terms appear in its certified claim." Mot. at 14. Defendant further asserts that the Complaint does not rely upon the same operative facts as the Certified Claim because the Complaint accuses DLA of "failing to cooperate," whereas the Certified Claim alleged a "failure to collaborate effectively." *Id.* at 15. Similarly, Defendant argues that the Complaint accuses DLA of "interfering" with ACES's performance, whereas the Certified Claim alleges that DLA "directed and controlled the methods used by the contractor." *Id.* Further, Defendant argues that the Certified Claim's "operative facts" "fell short of demonstrating the specific targeting necessary to give rise to a breach of an implied duty of good faith and fair dealing." *Id.* at 14. This argument rests upon its

assertion that a breach of the implied duty of good faith and fair dealing requires that a government official "specifically targeted" the contractor. *Id.* (citing *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 829 (Fed. Cir. 2010)).

Plaintiff responds that it was "not required to use specific *labels* in its CDA Claim or Complaint, but must only rely on the same operative facts presented to the CO." Resp. at 21 (emphasis in original). Plaintiff argues that its Complaint presents the same facts related to the alleged breach of the implied duty of good faith and fair dealing, and that Defendant's argument relies upon "semantics between 'collaborate' and 'cooperate.'" *Id.* at 22. Plaintiff analogizes its case to *ECC CENTCOM Constructors*, in which a plaintiff met the presentment requirement for a claim arising from the duty of good faith and fair dealing. *See id.* at 22–23; *ECC CENTCOM Constructors, LLC v. United States*, 166 Fed. Cl. 612, 618 (2022). Plaintiff also attacks Defendant's reliance upon *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 829 (Fed. Cir. 2010), as that case dealt with the merits of a good faith and fair dealing claim, rather than whether a good faith and fair dealing claim met the presentment requirement. Resp. at 24.

Here, the Certified Claim presented the implied duty of good faith and fair dealing claim to the CO. This case closely resembles *ECC CENTCOM*. *See ECC CENTCOM*, 166 Fed. Cl. at 618. In that case, as here, defendant sought to dismiss a good faith and fair dealing claim under the CDA because the contractor's certified claim did not use the phrase "good faith and fair dealing." *Id.*. The contractor met the presentment requirement because the certified claim used the phrase "failure to cooperate," which put the contracting officer on notice that the contractor raised a good faith and fair dealing claim. *Id.* ("[I]t is entirely inept to say that an allegation of failure to cooperate would deprive a contracting officer of adequate notice of the contractor's allegation of violation of good faith and fair dealing."). The contractor's complaint alleged the

same operative facts as the certified claim, except for some "trivial" distinctions in how the facts were presented. *ECC CENTCOM*, 166 Fed. Cl. at 618. Here, Plaintiff used the phrase "failure to collaborate effectively" in its Certified Claim. Certified Claim at 2. The difference between "cooperate" and "collaborate" is a trivial distinction because each word refers to multiple partners working together. *See* Merriam-Webster, *cooperate*, https://www.merriam-webster.com/dictionary/cooperate ("to act or work with another or others"); Merriam-Webster, *collaborate*, https://www.merriam-webster.com/dictionary/collaborate ("to work jointly with others"). Here, the Certified Claim put the CO on notice that ACES intended to raise a good faith and fair dealing claim because the phrase "failure to collaborate effectively" is only trivially different from the failure to cooperate that is a classic basis for good faith and fair dealing claim. *See Precision Pine*, 596 F.3d at 820 n.1 ("Both the duty not to hinder and the duty to cooperate are aspects of the implied duty of good faith and fair dealing."). Similarly, the Certified Claim's assertion that DLA "directed and controlled the methods used by the contractor" is only trivially different than the Complaint's allegation of "interfering," so the CO was on notice of the type of claim that ACES brought. *See* Mot. at 15.

In addition to putting the CO on notice of a good faith and fair dealing claim, the Certified Claim relied upon the same operative facts as the Complaint, so Plaintiff has met the presentment requirement. In its Complaint, Plaintiff alleges two bases for the breach of the implied duty of good faith and fair dealing. Compl. ¶¶ 39–40. First, Plaintiff claims that DLA "withheld vital information" that it should have disclosed under the implied duty. *Id.* ¶ 39. Although the Certified Claim did not use the term "withheld vital information," the Certified Claim alleged that "the government made no mention" of information that significantly affected ACES's ability to perform. Certified Claim at 2. These descriptions of the relevant facts are materially the same, as

the CO had sufficient information from the Certified Claim to understand that ACES claimed DLA had information about the IDES environment, failed to turn that information over to ACES, and thus increased ACES's costs. *See* Certified Claim at 1–2.

Second, Plaintiff claims that DLA breached the implied duty "by interfering with ACES's means and methods of its work under the Contract and failing to cooperate with ACES, including by failing to provide sufficient resources." Compl. ¶ 40. The Certified Claim also discusses "DLA's failure to collaborate effectively with ACES, including its failure to provide sufficient resources as required under the contract." Certified Claim at 2. This almost exactly matches language used in the Complaint. *See* Compl. ¶ 40. Plaintiff is correct to emphasize that Defendant's argument relies upon "semantics," as "failing to cooperate" and "failure to collaborate effectively" are similar enough that they reference the same operative facts. *See* Resp. at 22. ACES met the presentment requirement for Count Two because its Certified Claim put the CO on notice of the good faith and fair dealing claim and relied upon the same operative facts as the Complaint. *See Scott Timber*, 333 F.3d at 1365.

Finally, there is no merit to Defendant's argument that Count Two fails to meet the presentment requirement because it allegedly does not plead that DLA "specifically targeted" ACES. Mot. at 14 (citing *Precision Pine*, 596 F.3d at 829). As an initial matter, Defendant's argument about pleading standards is not relevant to the presentment requirement; rather, the pleading standard is relevant to whether Plaintiff has properly stated a claim for relief based on breach of the implied duty of good faith and fair dealing. *See infra* Discussion IV.A (explaining the legal standard to plead a breach of the implied duty of good faith and fair dealing). Next, Defendant misstates the legal standard; the implied duty of good faith and fair dealing does not require specific targeting, and Defendant ignores binding precedent holding that *Precision Pine*

did not create such a requirement. *See Metcalf Constr. Co. v. United States*, 742 F.3d 984, 993 (Fed. Cir. 2014) ("[T]he court in *Precision Pine* did not hold that the absence of specific targeting, by itself, would defeat a claim of breach of the implied duty."). Accordingly, Defendant's arguments that Count Two does not meet the presentment requirement fail.

## III. Defective Specifications

Count One of the Complaint recites a claim based on defective[5] specifications: "DLA provided specifications that contained multiple deficient and inaccurate descriptions which resulted in ACES's incurrence of increased work and associated costs to comply with the requirements of the Contract." Compl. ¶ 30. Defendant moves to dismiss the Complaint for failure to state a claim for relief based on defective specifications because the DLA never provided any design specification at all concerning the aspect of the system of which Plaintiff complains—the IDES environment. Mot. at 17. Plaintiff never identifies a design specification for an operational software environment in the Task Order, either. *See* Resp. at 25–26. As such, the Complaint fails to state a claim based on defective specifications, which requires a design specification, and Defendant's Motion to Dismiss pursuant to Rule 12(b)(6) is granted with respect to Count One.

### A. <u>Legal Standard for Defective Specifications</u>

A government contract that contains design specifications contains an implied warranty against defective specifications: "[I]f the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences

---

[5] Plaintiff references this claim as a "Deficient Specifications" claim. Compl. at 5. The United States Court of Appeals for the Federal Circuit has routinely called such claims "defective specification" claims. *See, e.g., Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1342 (Fed. Cir. 2008); *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed. Cir. 1987); *Sheffield Korte Joint Venture v. Sec'y of the Army*, No. 2024-1134, 2025 WL 1466934, at *2 (Fed. Cir. May 22, 2025). Accordingly, the Court references Count Two as a "defective specification" claim throughout this Memorandum and Order.

of defects in the plans and specifications." *United States v. Spearin*, 248 U.S. 132, 136 (1918) (citations omitted) "The *Spearin* doctrine provides that if a government contract contains detailed design specifications, as opposed to performance specifications, the government gives an implied warranty that if the specifications are followed an acceptable result will be produced." *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1344 (Fed. Cir. 2008); *see also Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1289 (Fed. Cir. 2000). The warranty does not attach when the contract uses performance specifications. *Rick's*, 521 F.3d at 1344–45; *Sheffield Korte Joint Venture v. Sec'y of the Army*, No. 2024-1134, 2025 WL 1466934, at *2 (Fed. Cir. May 22, 2025). "Design specifications explicitly state how the contract is to be performed and permit no deviations. Performance specifications, on the other hand, specify the results to be obtained, and leave it to the contractor to determine how to achieve those results." *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed. Cir. 1987).

**B. <u>Complaint's Allegation of Defective Specifications</u>**

Defendant contends that the Complaint fails to identify any specification in the Task Order that promises an operational (rather than IDES) environment. Mot. at 17 ("These assertions lack sufficient facts, such as the where, why, and how, to show that DLA in fact provided the purported 'specifications' or even had a duty to do so."). Specifically, Defendant argues that the contract used performance specifications, rather than design specifications. *See id.* ("The broad wording shows that the task order did not require ACES to follow the precise detail set forth in the task order."); ECF No. 28 (Oral Argument Transcript or OA Tr.) at 16:19–20 ("This was a performance specification."). Defendant also argues that the Task Order does not contain specifications for software components that, the Complaint alleges, were affected by the IDES environment, such as

Decision Support Services and Conduct Platform Configuration. Mot. at 17[6] (citing Compl. ¶¶ 33–34). Not only did the contract not provide the specifications that Plaintiff now disputes, Defendant argues, but the contract explicitly asked ACES to define the requirements and determine, on its own, how to accomplish the Task Order's goals. Mot. at 18; ECF No. 13-1 at 17 ("The contractor shall provide requirements analysis, design, configuration, code and testing . . .").

In response, Plaintiff fails to identify any particular defective specifications in the Task Order. *See* Resp. at 25–26. Plaintiff similarly does not explain why the Task Order should be interpreted as including design specifications, rather than performance specifications. *See id.* Plaintiff explained at oral argument that the Task Order should be interpreted as a design specification because Plaintiff had to work on DLA-supplied software: "[W]hen they say you're using our existing SAP software, and you're using our data, that's a design specification." OA Tr. at 33:8–10. In addition, Plaintiff highlights language in a contract modification—agreed to by DLA—explaining that the IDES environment was "deficient because software was outdated." Resp. at 26; Compl. ¶ 18.

Defendant is correct. A defective specification claim requires a contract that contains design specifications. *See Rick's*, 521 F.3d at 1344 (holding that *Spearin* doctrine only applies "if a government contract contains detailed design specifications"). The Task Order here required

[6] The Court may consider the text of the Contract on this Rule 12(b)(6) Motion although the Contract was not attached to the Complaint as an exhibit. *See* Compl. Specifically, the selections from the Contract, which are attached to the Motion and Response, may be considered because the Complaint incorporated the Contract by reference. Resp. at 7 n.2; *see Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference."). A contract is incorporated by reference into a complaint if the complaint cites or relies upon the contract, even if the contract is not an exhibit to the complaint. *See R&R Conner Aviation, LLC v. United States*, 174 Fed. Cl. 89, 93 n.3 (2024) (contract incorporated into complaint because complaint cited contract); *ASI Constrs., Inc. v. United States*, 129 Fed. Cl. 707, 710 n.2 (2016) (contract provisions incorporated into complaint because complaint relied upon those provisions).

Plaintiff to create specifications for the software—Plaintiff defined the means by which it could perform the Task Order. *See* ECF No. 13-1 at 17 ("The contractor shall provide requirements analysis, design, configuration, code and testing . . ."). While not binding, the Court notes that the Armed Services Board of Contract Appeals (ASCBA) persuasively found that similar language constituted a performance specification in *David Boland*. *See David Boland, Inc.*, ASBCA No. 60498, 2025-1 BCA ¶ 38,787, 2025 WL 1064744 (Mar. 6, 2025). There, the contractor had to modify government-owned property (a floodwall in New Orleans, Louisiana) by installing a concrete plug into a floodwall's existing foundation. *Id.* at 188,637. The foundation contained undisclosed defects (voids and existing timber piles), which the contractor allegedly did not expect, and which made performance more difficult. *Id.* at 188,649. The contractor argued that the undisclosed defect in government-owned property constituted a design specification. *Id.* at 188,653. The ASBCA found that, to the contrary, the contract contained performance specifications. *Id.* The contract contained performance specifications because, as the ASBCA emphasized, the contract said that "[t]his work shall consist of designing" and "[t]he Contractor shall be solely responsible for the design" of the modifications to the foundation. *Id.* "Since the [concrete plug] specifications specified the results [the agency] sought to achieve but left discretion of how to design the [concrete plug] to [David] Boland, they were performance specifications, not design specifications." *Id.* at 188,654.

The Task Order here is analogous as Plaintiff had to modify government-owned equipment—software, rather than a floodwall—to meet a particular goal. ECF No. 20-1 at 12 ("assist and conduct platform configuration development on existing SAP software licenses"). The Complaint alleges that, like the floodwall in *David Boland*, the software that DLA provided was "deficient." Compl. ¶¶ 30, 31. The Task Order contains similar language as the contract at issue

in *David Boland* concerning Plaintiff's obligation to determine the best method of performance, as the Task Order assigned Plaintiff the responsibility to "provide requirements analysis, **design**" and to "**Develop** deployment plans." ECF No. 20-1 at 14 (Task 3), 17 (Task 7) (emphases added). As in *David Boland*, these are performance specifications because Plaintiff retains the discretion to determine the best way to meet the required goal. *See Stuyvesant Dredging Co.*, 834 F.2d at 1582 As the Task Order contains performance specifications, not design specifications, Plaintiff has failed to plead the required elements for a defective specification claim. *See Rick's*, 521 F.3d at 1344.

At oral argument, when asked to identify where the Task Order promises an operational environment, Plaintiff argued that three of the tasks in the Task Order together form a specification for an operational environment: Tasks 3, 4, and 7. OA Tr. at 33:12–14 (the Court asking Plaintiff to identify the specifications in the Task Order); 33:22–34:5 (Plaintiff's response). None of these three tasks contain detailed design specifications for an operational environment, nor do any of these tasks mention either an operational or IDES environment. *See* ECF No. 20-1 at 14–15 (Task 3), 15 (Task 4), 17 (Task 7). Task 3 requires Plaintiff to test the software as a pilot program at three DLA sites, and the requirements include "provid[ing] requirements analysis, design, configuration, code and testing." ECF No. 20-1 at 14. Task 4 requires Plaintiff to develop plans to deploy the software to many more DLA sites, including a responsibility to "fully define requirements" for the deployment at different sites. *Id.* at 15. Task 7 requires Plaintiff to actually deploy the software, in which Plaintiff has the responsibility to "[d]evelop a template for DLA warehouse implementations." *Id.* at 17. Plaintiff argues that it had to use an operational, rather than IDES, environment to accomplish these tasks. OA Tr. at 34:1–2 ("[W]hen the government is asking us to put this in actual operation, this is an operational environment."). Technical

constraints might lead Plaintiff to prefer an operational environment, but nowhere in Tasks 3, 4, and 7, is there a design specification requiring that Plaintiff must use an operational environment. ECF No. 20-1 at 14–15, 17. The distinction between design and performance specifications depends upon "the amount of discretion given to the contractor in implementation," and, as all three tasks grant discretion to Plaintiff, they are performance specifications.[7] *Sheffield-Korte Joint Venture*, 2025 WL 1466934 at *2.

Finally, Plaintiff's reference to stray language in a contract modification does not establish that the Task Order contained defective specifications. Plaintiff highlights language in a contract modification—agreed to by DLA—explaining that the IDES environment was "deficient because software was outdated." Resp. at 26; Compl. ¶ 18. This statement in a contract modification explains why the DLA needed to modify the Task Order—a deficient environment would naturally increase the scope of a project—but the change does not indicate that the Government had provided any incorrect specifications to Plaintiff. *See* ECF No. 20-2 at 3–4. The modification language says that the software itself was defective, not that any specifications were defective. *See id.* This modification language fails to establish that the Task Order contained design specifications, without which Plaintiff cannot plead a claim for defective specifications. *See Rick's*, 521 F.3d at 1344.

[7] Plaintiff argues that the amount of discretion assigned to a contractor "is 'a question of contract interpretation,' which cannot be decided on the pleadings alone." Resp. at 27 (quoting *Blake Constr. Co. v. United States*, 987 F.2d 743, 746 (Fed. Cir. 1993)). *Blake*, however, undermines Plaintiff's argument, as that case establishes that the amount of discretion conferred by a contract "is a question of contract interpretation which is a matter of law." *Blake*, 987 F.2d at 746. Indeed, it is well-established that "[c]ontract interpretation is a matter of law and thus may be addressed by the Court in resolving a motion to dismiss." *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014) (quoting *S. Cal. Edison v. United States*, 58 Fed. Cl. 313, 321 (2003)).

The Complaint also makes two oblique references to classroom training sessions that Plaintiff purchased for DLA's use under the Contract: "DLA required ACES to perform many more classroom sessions despite the Contract stating that 30 SAP classroom sessions were to be performed." Compl. ¶ 35; *see also id.* ¶ 27 (claiming that the Certified Claim presented the SAP classroom sessions allegation). At oral argument, Plaintiff's counsel clarified that Plaintiff intended to bring a defective specification claim for the classroom sessions: "it's deficient in the sense that the government told us we only had to provide 30, and [] we had to do more." OA Tr. at 45:12–14.

Plaintiff fails to state a defective specification claim concerning the increased number of classroom sessions because the Contract does not contain a design specification for the classroom sessions. The performance requirement for Plaintiff to provide SAP classroom sessions is vague and provides flexibility for the specific method by which Plaintiff must perform to be decided at a future date. *See* ECF No. 20-1 at 17 ("The classes . . . will be selected based on an individual site's needs."). This language does not "state how the contract is to be performed and permit no deviations" because it does not provide sufficient instructions. *See Stuyvesant Dredging*, 834 F.2d at 1582. As such, the SAP classroom requirement is not a design specification, and Plaintiff cannot bring a defective specification claim based on the requirement. *Rick's*, 521 F.3d at 1344. The Court does not consider whether Plaintiff has pled any other type of constructive change for the SAP classroom requirement because Plaintiff specified at oral argument that it only asserts a defective specification claim here.[8] *See* OA Tr. at 45:12–14.

[8] While Plaintiff fails to state a claim related to the SAP classroom sessions under Count One, this Memorandum and Order does not preclude—at this stage—the possibility of recovery under Count Two.

## IV. Implied Covenant of Good Faith and Fair Dealing

Pursuant to Rule 12(b)(6), Defendant also moves to dismiss ACES' claim for relief in Count Two: that DLA breached its implied duty of good faith and fair dealing. Mot. at 19; Complaint ¶ 39–40.

### A. Legal Standard for Implied Duty of Good Faith and Fair Dealing

"The covenant of good faith and fair dealing . . . imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). A breach of the covenant of good faith and fair dealing, contrary to Defendant's assertions, does not require allegations that the government specifically targeted the plaintiff or acted in bad faith.[9] *See Metcalf Constr.*, 742 F.3d at 993 ("[T]he court in *Precision Pine* did not hold that the absence of specific targeting, by itself, would defeat a claim of breach of the implied duty."); *see also Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 770 (2005) ("[I]t is clear, particularly when the specific aspects of the duties to cooperate and not to hinder are at issue, that proof of fraud, or quasi-criminal wrongdoing, or even bad intent are not required."). "The implied duty of good faith and fair dealing is limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value." *Metcalf Constr.*, 742 F.3d at 991. Although breach does not require the violation of an expressly written contract covenant, "a specific promise must be undermined for

[9] While Defendant argued in its Motion that a breach of the implied duty requires "specific[] target[ing]," Mot. at 19 (citation omitted), at oral argument, Defendant acknowledged that Plaintiff need not plead bad faith to establish a violation of the implied duty of good faith and fair dealing. OA Tr. at 17:13 ("They don't have to [show bad faith].").

the implied duty to be violated." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) ("[T]he duty must be 'keyed to the obligations and opportunities established in the contract,' so as to not fundamentally alter the parties' intended allocation of burdens and benefits associated with the contract.") (quoting *Lakeshore Eng'g Servs., Inc. v. United States*, 748 F.3d 1341, 1349 (Fed. Cir. 2014)).

Plaintiff specifically brings a superior knowledge claim, which is a subset of a good faith and fair dealing claim. *See* Resp. at 28; OA Tr. at 44:3–6. "Under the superior knowledge doctrine, there is an implied duty for the government 'to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance.'" *Sage Acquisitions LLC v. Sec'y of Hous. and Urb. Dev.*, 119 F.4th 973, 984 (Fed. Cir. 2024) (quoting *Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000)). Superior knowledge claims require the following elements:

> The doctrine of superior knowledge is generally applied to situations where (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*Scott Timber*, 692 F.3d at 1373.[10]

### B. <u>The Complaint's Allegation of Good Faith and Fair Dealing</u>

Defendant's Motion devotes several pages to an argument that the Complaint fails to plead specific targeting against ACES. *See* Mot. at 19–21. As discussed above, an allegation of specific

[10] Defendant cites *Scott Timber* for these elements. Mot. at 20. Plaintiff cites identical language for the standard from an earlier case. Resp. at 28 (citing *Hercules, Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994)).

targeting is not required to state a claim, so the lack of such an allegation in the Complaint is legally irrelevant. *See supra* Discussion IV.A.

Defendant also argues that Plaintiff failed to plead the elements of a superior knowledge claim. Mot. at 20 ("[T]he complaint does not allege any facts supporting any of the four factors for the superior knowledge doctrine."). The Motion characterizes the superior knowledge claim as "far-fetched . . . even in a colloquial sense." *Id.* As the Task Order repeatedly referred to Plaintiff as the expert for SAP software, "the expertise resided firmly with ACES and its subcontractor, but not DLA," as a result, Defendant argues, a superior knowledge claim is implausible. *Id.* Defendant argues in its Reply that the Complaint failed to plead the DLA's awareness that ACES had insufficient knowledge. Reply at 19. Defendant highlights several facts mentioned in the Complaint, which purportedly demonstrate it was unlikely that DLA knew about the software environment. *See* Reply at 19–20. In short, Defendant argues that, contrary to the facts in the Complaint, DLA was not, in fact, aware of the software environment. *Id.*

Plaintiff responds that the Complaint includes sufficient facts for a superior knowledge claim. Resp. at 29–30. Plaintiff cites several paragraphs in the Complaint that, together, could constitute a superior knowledge claim. Resp. at 29. Plaintiff also argues that the failure to disclose information about the software environment could breach the implied duty of good faith and fair dealing even though "the Contract does not expressly detail the exact software environment." Resp. at 28. Although the Complaint does not use the label of a superior knowledge claim, at oral argument, Plaintiff clarified that it intended to bring a superior knowledge claim. OA Tr. at 44:3–6 ("I think what we're alleging here primarily at this stage in the litigation is that they didn't tell us something before we started, and that's a superior knowledge claim."); *see also* OA Tr. at

43:14–16 ("[S]uperior knowledge is a subset or closely related to the duty of good faith and fair dealing.").

Here, the Complaint pleads sufficient facts, if proven, to establish a violation of the implied duty of good faith and fair dealing through a superior knowledge claim, as Plaintiff argues. First, the Complaint alleges that ACES lacked knowledge of the IDES environment before performance began. *See* Compl. ¶ 12 ("The fact that ACES's MVP SAP WMS was being deployed in an IDES environment was not disclosed to ACES by DLA prior to Contract award. ACES only learned of this fact months into the [Period of Performance]."). Second, the Complaint alleges that DLA "withheld" knowledge. *See id.* ¶ 39 ("DLA withheld vital information which had material impacts on ACES's ability to perform the work under the Contract."). Third, the Complaint alleges that the specification did not put ACES on notice to inquire about the IDES environment. *See id.* ¶ 12. Finally, the Complaint alleges that DLA did not tell ACES about the IDES environment. *See id.* ¶ 39. These facts, if proven, would meet the elements for a superior knowledge claim. *See Scott Timber*, 692 F.3d at 1373. Thus, ACES has successfully pled a claim for DLA's breach of the implied duty of good faith and fair dealing.

Defendant's assertion that the superior knowledge claim should be dismissed because it is "far-fetched" misunderstands the Rule 12(b)(6) standard. *See* Mot. at 20. The 12(b)(6) standard asks whether a claim is "plausible," *Iqbal*, 556 U.S. at 678, and Plaintiff's superior knowledge claim is plausible, even if it eventually might be difficult to prove. Similarly, Defendant's factual argument that DLA lacked awareness of ACES's insufficient knowledge misunderstands the pleading standard at this stage. *See* Reply at 19 ("The complaint allegations and the contract documents together show that DLA was not omniscient regarding the SAP system it paid contractors to configure and implement."). At oral argument, Defendant's counsel acknowledged

that Plaintiff's Complaint could be interpreted to allege that "maybe DLA should have been a little more forthcoming." OA Tr. at 17:19–20, 24–25. Construed in favor of the Plaintiff (the non-moving party here), the Complaint plausibly alleges that DLA was aware of ACES's insufficient knowledge. *See* Compl. ¶ 39 ("DLA withheld vital information which had material impacts on ACES's ability to perform the work under the Contract."); *Boyd*, 134 F.4th at 1352 ("'We take all factual allegations in the complaint as true and construe the facts in the light most favorable to the non-moving party.'" (quoting *Jones*, 846 F.3d at 1351)). Defendant's statements that DLA was unlikely to have superior knowledge are inappropriate for this Court to consider in assessing its Rule12(b)(6) Motion. Thus, Defendant's arguments that Plaintiff failed to adequately plead a breach of the implied covenant of good faith and fair dealing fail.

* * * * *

## CONCLUSION

Accordingly, for the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Dismiss (ECF No. 13). The Court **DENIES** the Motion to Dismiss for lack of subject matter jurisdiction. The Court **GRANTS** the Motion to Dismiss for failure to state a claim with respect to Count One of Plaintiff's Complaint. The Court **DENIES** the Motion to Dismiss for failure to state a claim with respect to Count Two of Plaintiff's Complaint. Accordingly, the Court **DISMISSES** Count One of Alamo City's Complaint (ECF No. 1).

The parties are directed to **CONFER** and **FILE** a Notice by **August 4, 2026**, attaching a proposed public version of this Sealed Memorandum and Order, with any confidential information relating to Plaintiff's technical approach document redacted.

IT IS SO ORDERED.

Eleni M. Roumel
ELENI M. ROUMEL
Judge

July 21, 2026
Washington, D.C.